Our first case on the call of the docket today, Wednesday, September 21, 2011, is agenda number 18, case numbers 111-286 and 111-304, Citizens Opposing Pollution v. Exxonmobil Coal USA. Counsel for the appellants. Good morning, Your Honors. Tim Eaton on behalf of the appellant, Exxonmobil. Your Honors, this case began, actually, in 1996 when Exxonmobil completed mining at the coal mine in question and the reclamation process was to begin. There was an application that suggested what the reclamation should be. It was subject to public comment. In fact, the president of the plaintiff of COP gave written comments. He also requested a public hearing. There was a public hearing. The final permit was issued in 2004. The IDNR had approved it. IEP had weighed in with respect to the groundwater. In 2005, he again appealed it in administrative review, which he had the right to do. There was a hearing officer appointed. The hearing officer confirmed the department's position. And then he chose not to pursue administrative review in the circuit court. He then filed an appeal with the Office of Surface Mining in the federal procedure. It went to the field office where the plan was affirmed. It went to the regional director. It went to the Interior Board of Land Appeals. It was affirmed. In 2008, he incorporated. And then there was a letter sent to the department and to Exxon giving them a 60-day notice for a citizen suit seeking to revoke the permit. At every stage that this case was heard, there was an opportunity for them to weigh in as to whether the department should issue the permit. And they took advantage of that. So for the plaintiffs and the Sierra Club in their amicus brief to suggest that the courthouse doors have been closed is simply not true. They've had ample opportunity. In 2006, when there needed to be a modification to the permit, they again filed an administrative appeal. They again had a public hearing. They again had the department's decision on this affirmed. Now they are seeking to collaterally attack the permit through a citizen suit. Yes, Your Honor. If we were to rule that it applies, in essence, the citizen's right to enforce the act because there had been prior administration action would always be barred. New plaintiffs in the future would always be barred from raising this issue. Is that correct? Your Honor, they would not be barred for two reasons. Number one, as to what the permit actually contained, yes. But a citizen suit is always available when the department is challenged as to whether or not they're enforcing the permit and there's a violation. The citizen can come in and give a 60-day notice to the department. If they don't take an action, then the department can, then the citizen can follow up. And the second circumstance is if someone is operating without a permit, then they can bring a citizen's suit. But with respect to what's decided in administrative review, the statute very clearly says, in Section 810, in the first sentence, that final administrative decisions of the department shall be subject to administrative review. So to look at all aspects of this statute, citizen suits are permitted in two circumstances. Whether it's administrative review, yes, Your Honor, they would be precluded from challenging the permit later. You take the position that there is no express right to a private action under the Water Use Act. Could we imply such a right? Under the Water Use Act, of course, you would have the authority to imply a right, Your Honor, but I do not believe it would be necessary because under the Water Use Act, it sets up a procedure where the Department of Agriculture is involved. Any complaints with respect to someone's right to use their water, they can file a tort action or they can go to the local conservation and water district working with the Department of Agriculture. There is an administrative process set up, and as this Court has held repeatedly, is where the statute provides for administrative procedures and it can be enforced. There's no need to imply a private cause of action. And we contend that the judge in the lower court was absolutely right, that there's no private cause of action under the Water Use Act. And in this case, the repercussions are immense because after we received the permit that had been approved by the Department, that had gone through administrative review, we went forward and reclaimed that land at an expense of $28 million. And now the plaintiff wants to come in in the guise of a citizen suit and say, well, you have to do it all over. We find unacceptable what you did. And I think Judge Becker in the trial court had it right when he said a permit is not issued unless the department is satisfied that the requirements of the act are met. To allow plaintiff's interpretation of the provisions of the act, a citizen suit could render the permit process meaningless and require circuit courts throughout the state to re-litigate permit issues after those matters have been addressed by the department. Now, unfortunately, the appellate court was wrong in one major assumption. The appellate court opinion said that they would allow the citizen suit because this involved an enforcement of the permit. They're just wrong. And the plaintiff concedes in their response to the PLA and in their brief that they were wrong. This does not involve an enforcement action. This involves a direct attack on the permit. They disagree with the department's decision. It's not a violation of what the permit allows. They are collaterally attacking what the department decided was an appropriate reclamation. And the legislature has given primary responsibility of deciding what should be done in Illinois coal mines, both with respect to their operations and with respect to their reclamations, to the department. And if the department makes a mistake, there's public hearings, there's administrative review, there's the circuit court, which they bypass, there's the appellate court if they don't agree with the circuit court, and there's this court. There's plenty of opportunity to directly attack the decision of the department they chose not to. Instead, four years after we had gotten the permit, two years after our reclamation was complete, they file a citizen suit saying you need to start over because we don't agree with your plan. Can there be an action alleging a violation of the act separate and apart from alleging violation of the conditions of the permit? Your Honor, I think the only, again, the only two instances that we see in looking at the statute would be as far as the permit is concerned, what is set out in the permit is final. But if they are operating in violation of the permit or, and perhaps this goes to your question, if they are doing things that the department can't do in violation of the act, then the proper procedure would be to file a 60-day notice with the department and on the owner and say you are doing this, it's not addressing the permit, it's in violation of the act, and at that point, then the department can modify or revise the permit. At least there would be a process. But in every jurisdiction, particularly the Pueblo case beside New York, or excuse me, New Mexico, they had this exact same issue. And in that case, the plaintiff hadn't gone through administrative review. And the court still said you're precluded because we are not going to allow collateral attacks on the permit after it has been issued. Because everyone is relying on it. Now the Illinois Coal Association has weighed in and they have said that these impoundments or RDAs, which we mentioned a number of times in our brief, have been permitted at every coal site, mining site in the state. If the citizen suit prevails here, all of those would be subject to being redone. And the difficulty from a policy point of view is not every coal owner is ExxonMobil. You've got some that are just getting by. And if they've spent millions of dollars to reclaim the land pursuant to a permit that they thought was final, what's going to happen? They may go into bankruptcy. And who's going to get stuck with remediating that land beyond what the department has already required? The taxpayers. So there's a real policy issue here that supports finality of the permit once it's been determined by the department. The other thing about administrative review, which this court well knows, is that you have the administrative expertise. If you have a citizen suit, they don't even have to be a party. That's another issue here. They're no longer a party. So if the judge, circuit court judge, were to decide that we have to do something different, we would be in violation of the permit and our obligations under the permit. So we're at risk. That's why this is a very important issue. Although the permit has expired, and there were two permits for these RDAs in 2005 and 2006, we are still subject to the obligations in those permits. We can't start over. And what the plaintiffs sought in their 60-day notice was a revocation of those permits. They've not changed those notices. Even though they amended their complaint to allege so-called violations, which is not true, because they concede, they just disagree with the department. So what we're asking this court to do, and again, the IDNR has filed a brief in support of our position because of the chaos this would create around the state if their final permits can be challenged after there's been administrative review and after the reclamation has taken place. IEPA is weighed in. The Coal Association is weighed in because coal mining is a very important business in this state. Actually, we have one of the third largest coal reserves in the country. No one's going to come here if they can't be sure that when they get a permit that they're not going to be subject to attack four years later, five years later, six years later. The department is in charge, and that's what the statute intended. So we respectfully ask that this court reverse the Fifth District on this issue. Secondly, and my time has expired, but just with respect to res judicata, we believe all the issues that were raised in the administrative review are the same issues that are being raised in this complaint. And in the trial court, the issues that were raised in the administrative review, the plaintiffs admitted privity or identity of parties, and they admitted that there was a final judgment of administrative review. So the only issue are the issues the same, and we have detailed in our briefs that the issues are exactly the same, and therefore they should be barred by res judicata. Thank you very much. May it please the Court, Brian Barrett, Assistant Attorney General on behalf of the Illinois Environmental Protection Agency. I think the counsel for the coal mine has thoroughly addressed most of the issues that are the same as to the EPA. I'm not going to repeat them. I do just want to stress a couple of points, though. Again, the public of Clinton County, Mr. Langenhorst, have had ample opportunity to challenge this permit. They've challenged it administratively. They had the opportunity to challenge it in court. They didn't do that. They've had public comment, opportunity to hold the record open after public comment, opportunity to hold the record open after public comment was finished. They've had opportunity for judicial review. They've had administrative hearings on this matter. The second point I want to stress is that, and I think counsel just touched on this, that in construing Section 805 and 810 together, it's the agencies and the coal mine's construction that best effectuates the legislative intent by harmonizing the statute so that both administrative review can survive and the citizen suit can survive. Under plaintiff's construction of the statute, administrative review essentially becomes meaningless. Under the agency's construction of the statute, however, citizen suit survives. It survives to allow citizens to properly enforce permit violations or to enjoin or enforce non-permitted activities. Again, the purpose of this Coal Mine Reclamation Act is to balance both the environment and the need for coal production, and the agency's construction of the citizen suit and administrative review provisions best accomplishes that end. Would the citizens not have a right to sue if there was, in fact, a violation of the Act that was not covered by the permit? If there was a violation of the Act that was not covered by the permit, yes, that would be something where they have the right to seek the attention of the DNR, send their 60-day notice in. But you're saying the 60-day notice, as Mr. Eaton referred to also, but not a separate right of action? Well, that's part of the citizen suit procedure. First you bring your 60-day notice, and then if the DNR does not act, then the citizens can go and bring their own suit. So they would still have that power to enforce that way. Mr. Barof, is that only in the situation that Justice Carmeier referred to that's a violation that's not in the permit, but it's a violation that's not in the permit? I'm saying that that's the procedure if there's a permit condition and the IEPA or whatever the agency is, I guess this is the agency in this case, is not enforcing the permit condition. Correct. That procedure applies in both situations. That's the procedure for the citizen suit provision. Where the citizen suit provision applies, you give the agency at least the opportunity to rectify, to remedy the problem. The citizens opposing pollution concern, the policy concern that they raised is that if we don't allow these collateral attacks on administrative permits, that pollution will go unremitied. But again, that's an unlikely scenario. Remember, this is both a state and federal joint regulatory system. There's federal oversight of the state regulations. Not only is there federal oversight, but again, Mr. Langenhorst and other Clinton County residents brought a citizens complaint with the Federal Office of Surface Mining, and they found that the state regulators had acted properly in remediating the groundwater. So now I just want to turn again to count five of the amended complaint, which is the count that is alleged against the Illinois EPA. And just to explain, because the appellate court said, decided that portions of the allegations there were constituted a collateral attack and were unpermitted, and portions did not and could proceed as an enforcement action. Our view is, and I think the language of the amended complaint bears out, that all of the essential allegations of the complaint are attack on the permit and not an enforcement action. The plaintiffs allege that the groundwater management zone was inadequate because it permitted the continuous release of contaminants in the groundwater and upset the hydrologic balance. They're not alleging, obviously, that the Illinois EPA is violating the permit. That wouldn't be impossible since the corrective action plan created by the EPA was actually part of the permit here. The Department of Natural Resources is the final decision maker here. The Illinois EPA is actually doing nothing at this point. They're not involved in enforcement. They obviously can't allege also for the same reasons that the Illinois EPA is engaging in non-permitted activity. Again, the Department of Natural Resources is the final decision maker here. They're the mine regulator. If there's a problem with the permit enforcement, that's the agency that is responsible for rectifying that. Both of the attacks here are solely attacks on the Illinois EPA's corrective action plan, the groundwater management zone that was included in the corrective action plan, and it's an improper collateral attack on the permit. Again, on the race judicata and collateral estoppel issue, the issue of whether there are excessive contaminants and the hydrologic balance of the groundwater is being disturbed has been litigated. It was litigated before the Department of Natural Resources. At the proceeding there, both the plaintiff and his expert witness admitted that the groundwater management zone and corrective action plan prevented material damage to the property. And before the Office of Service Mining, the issue was again litigated and the federal agency found that the state regulators have acted properly under state rules. Citizens Opposing Pollution has raised a number of equitable challenges to the application of race judicata, and again, one of the objections they raised is they didn't have ample opportunity to contest the permits. As has been stated repeatedly, they've had public notice, a public hearing was held. Mr. Langenhorst testified at the public hearing. They both had the opportunity for administrative appeal and sought such administrative appeal. There's been no allegation of any change in the law or regulations governing groundwater remediation. The regulatory standards here are the same as when the permits were issued, and in the absence of any such change performance standards, there's no going around the bar of race judicata or collateral estoppel in this case. Again, the Illinois EPA would request that the appellate court's decision be reversed and the circuit court's decision dismissing count five of the amended complaint be affirmed in its entirety. Mr. Baroff, let me ask you this question. When you mentioned about there's no change in performance standards, I'm not sure exactly what that means, but let me pose this question. Let's assume everybody in this case agrees with the permits. I know they don't, but were properly issued in the first instance. And if you have a permit that runs a long time and technology changes, and it's really undisputed that the conditions are now outdated or deficient because there's higher degree of sophistication of detecting water pollution, how does a citizen, if the IEPA doesn't act on that, how does a citizen get that into the mix? The citizen would get that into the mix if the regulatory standards themselves changed. But I'm saying if they don't change. If they change, then I think it's up to the citizen to act politically to get those regulatory standards changed. Is there a procedure for the citizen to bring out regulatory change about? I believe there's always political pressure that can be put on agencies. I'm not talking about politics. I just want to know about the science of it and then the agency. If they have groundwater monitoring wells that have a certain type of sophistication and they were the proper tool back 15, 20 years ago, but now we have a better detection system, how do you get that into the mix? I don't know the exact answer to that. There are methods to change regulations to bring these things to the attention of the agency to change standards. And if standards were changed, and what I mean by performance standards, I mean the regulatory standards for what constitutes pollution, then at that point the operators would presumably have to get a new permit. But as far as the exact mechanism, I don't know as I stand here. Thank you. Counsel for the appellee. May it please the Court, Penny Livingston for Citizens Opposing Pollution. Citizen suits are authorized to compel compliance with the performance standards of the Mining Act. And those performance standards should be in a permit. They don't happen to be in this permit. Appealing a permit and going through an administrative process is separated in the very language of the legislation from compelling compliance. This Court recognized in Glisson v. Marion when they were citing the House Committee notes that it is a fundamental right to have a healthful environment, this is in our Constitution, and that the expression of this right provides the vehicle for the individual to prosecute a violator. So when they talk about the reproach. Ms. Livingston, let me ask you a little something about the facts here to make sure I understand them. Certainly. And then a question after going through them. Plaintiff's president filed an administrative challenge to these same revised permits and litigated that issue, right? That's true. Okay. And the plaintiff's president lost before the administrative body. That's true. And the plaintiff's president chose not to pursue an appeal of that matter. Is that also true? That's true as well. So we're right so far. In fact, the trial court who had a completely different opinion here found this suit to be a thinly veiled second bite of the apple, for lack of a better term. Is that right? I would say he did. Of course, the administrative appeal had nothing to do with permanent impoundments, and it was about an active coal mine. Those were active permits. Would you agree that the foundation of the appellate court's holding was that this was an action to enforce permit compliance? I would agree that it was to enforce the performance standards of the statute. As Judge Goldenhurst pointed out, and it is in his opinion, permit condition C requires that the applicant be in compliance with all applicable state and federal laws and with the performance standards of this act. Well, they're not. So I could enforce the permit if I wanted to, but when they came in and they said our permit expired, then there would be no reason to enforce an expired permit, would there? Is Mr. Eaton right that the plaintiff conceded that Monterey had complied with the permits and stated for the record that it was not challenging compliance? Is that somewhere in this record? I think that in the administrative appeal there was an issue about the hydraulic balance, and Exxon presented evidence that they had put in a slurry and said, I think there was some kind of acquiescence when they were doing summary judgment about the material balance of the aquifer. So you're saying with respect to a certain issue, they don't have a problem with compliance? I wouldn't say that, but I would tell you that that administrative appeal was then appealed to the Federal Office of Surface Mining, and they determined that the groundwater issue was premature. And by the way, when they say about their unlikely scenario, everyone knows what's going on here. The groundwater is poisoned, and no one in that area can use the groundwater for their drinking water anymore, even though they've used it for generations. Since the law requires that you have to return the land to its prior use, which was prime farmland, and they haven't done that, since the law requires you have to return it to the natural contours, and they haven't done that, since the law says no final land use can be done with anything but clean water, and this is hazardous substances here, 400 acres of it, then you can't have that as a final use. So whether your permit authorizes it or not, and this is why. Let me just ask this final question, and then we'll let you go. If this Court finds that this is about an attack on the permit versus compliance, if we find that, I'm not saying we are, I have no idea, but if we find that it's an attack on the permit rather than compliance, isn't the trial judge right that this is, that that should have been handled administratively, in fact, indeed was handled administratively, and in the trial court's words, a second bite at the apple, and ours may be a collateral attack on the final administrative ruling?  I would say that that's not true, and I would say it like this, considering that the statute itself, and this is a case of statutory interpretation, says that you can seek judicial review for all final agency decisions. We're not seeking any kind of review of a final agency decision. The permits are over with. We're trying to enforce the performance standards for the site conditions. That's what environmental prosecutors do. They enforce the law. The site conditions, not an administrative decision. You can't go and get a permit that lets you violate the standards of the law when that law says that all final agency decisions, go do judicial review through the administrative review lock, but the administrative review law may not impair or exclude any remedies found in this law. You're saying that the permit itself does not comply with the law. Is that what you're saying? The permit does not comply with the law. That's the truth. It definitely is unlawful, but I'm not attacking the permit because I don't have to. I can compel compliance with the performance standards of the Act. And the performance standards of the Act say that when you're done with reclamation, you can't leave permanent impoundments, 422 acres of high hazard dams made of acid leaching production waste to be sitting on people's aquifer. You don't get to do that. You have to help me. I'm not an engineer. I'm a lawyer. I don't understand those words, but I do understand words like administrative review and permit and words like that. So let's go back. Show me in your complaint that this is an action that is about enforcement and not an attack on the permits themselves. All right. I may not be able to tell you exactly each count what they are, but the first count would be that they have contaminated the groundwater. And while Mr. Eaton talked about the state policy, the state policy is listed in this law, and it specifically says So going back to the complaint, I'm not an engineer. I'm just a lawyer. Let's talk about the complaint. In the complaint, you talk about impoundments, right? Is there any reference to impoundments in the permits that we're talking about? No. The permit doesn't reference impoundments, but what the permit does do is it authorizes their refuse disposal areas to be considered and to compare the permits to the allegations in your complaint. Is that how we need to understand the nature of your complaint? No, you wouldn't need to, because the permits are independent of the site conditions. And this is at the end. Now, if you were trying to challenge an active mining permit, I don't believe that a citizen could stop the mine from mining if they had a permit. This permit has expired, it's over with. When you're done with your permits, the law says, and the policy of the state of Illinois is, that you are to take the affected lands and you are to conserve and reclaim them in order to restore them to an optimum future use. Well, there is the optimum future use, according to the statute, is the prior use or a higher use. The prior use was prime farmland. Well, 400 acres of hazardous waste is not prime farmland. So you don't have to go to the permit where they're authorized to have cropland that's not cropland or pastureland that's not pastureland, because the Constitution allows citizens to go forward when the legislation lets them go forward to protect a healthful environment. And this legislation says, if you're an affected person, you can compel compliance with the statute. Is there any overlap, Ms. Livingston, between the challenges and the administrative agency, and what's before this court today? Yes, the end use of cropland was before that agency, affecting the material balance of the aquifer was before that agency. The groundwater issues were determined to be premature. The issue of a permanent impoundment, which, by the way, solves all the other issues. If you remove the source of contamination, we can have our groundwater back. So the issue of permanent impoundment couldn't have been raised because they were continuing their permit. So you didn't know that reclamation was complete. And until reclamation is complete, you don't realize they're not in compliance with the statute. By the way, the statute that authorizes the permit system, you cannot have a permit system that can then overrule the performance standards of a statute. And you seem to be arguing that the permits violate the statute, that you're attacking the permits. Is that what you just said? The permits do violate the statute. And if I wanted to attack the permits. I'm really struggling to know what your complaint is about. Are you talking about are the permits unlawful? Is that what you're saying here? The permits are unlawful. But the permits have expired. And we don't have to enforce the permit or challenge the permit because that's not the exclusive remedy under this law. This law says you have the right to compel compliance with the law independent of the permit that they happen to get that's illegal. And compliance with the law is you don't get to have permanent impoundments and you have to have the prior use or a higher or better use when you're done with the land. The entire legislative intent, we talked about policy, the entire legislative intent is to have our lands restored to productive use. And when you look at the intent of the legislature and wouldn't you interpret the statute to fulfill the intent of the legislature? The intent of the legislature is clear. It says to restore, protect, and enhance the groundwaters of the state as a natural and public resource. We need our groundwaters restored. I suppose I could have brought a nuisance case, but why when I have a statute that authorizes me to compel compliance and under Micah-Timber you violate the statute, you get your injunctive relief. Is the overlap between what was challenged in the administrative agency versus what's before this court, is that a collateral attack? With respect to the allegations before this court at this time that were brought before the agency as a challenge? I don't think it is because I don't think you have to collaterally attack a permit nor enforce a permit if you have a violation with the underlying statutory provisions. That's why you even see in the statute that it authorizes not only can you sue the violator, you can sue a government agency if they're violating the statute. Any import to the fact that there wasn't an appeal of the ruling of the administrative agency on those issues? What would be the point? That's what I think the client thought. What would be the point? When you can't even get ID&R to acknowledge that hazardous waste dump is not cropland or a higher or better use than the prior use. But I would say this, if you look at res judicata, there are exceptions to res judicata as well. And we fall under every single exception. The judgment in the first action, a permit appeal, is inconsistent with the equitable implication of a statutory scheme. Well, the permit says comply with all the laws, but the permit lets them have an end use that doesn't comply with the law. The permit lets them continue to poison people's drinking water. Not allowed under the law. Could the citizens totally ignore the administrative procedure, not participate at all, and bring their own lawsuit because they don't like what they see or they don't like the results of what's happened? I think if you have an active mind that's operating and you don't like the conditions of their permit, you have to go through the administrative review law to challenge those permit conditions. If you are at the end and it's reclamation and they say it's over with, you can't have site conditions that are out of compliance with the law. So your complaint is that either that the state agencies didn't do enough or that they didn't exact the correct standards. Is that right? Essentially, the state agency is letting them poison the groundwater, which isn't allowed by the law. They're letting them have permanent impoundments, which isn't allowed by the law. They're not returning the land to the natural contours. Not allowed by the law. On, you know, taking the other side, how could a mine operator assure that they're in compliance with the law if later on they find out, well, the private citizens are dissatisfied with the state's efforts? I can tell you the answer to that. Make your application lawful. Don't put unlawful things in your application for the IDNR to rubber stamp. Don't say you're going to leave your poisonous pits sitting on people's aquifers to get approved. They know what the law is. They know what the regs are. And they knew that their application was unlawful. So if you're out there, and I noticed the Coal Association said there are RDAs like this all over the state. That's scary. I don't know what those other RDAs are doing, but these RDAs are poisoning people's drinking water. And it's not allowed. It's not permitted. It's not the policy of the state of Illinois to allow pollution. We are supposed to be returning the land. The whole point of the mining law. Two points. One, to get you a permit so that you can mine. Okay? We need to mine. That's good. And two, to make sure that when you're done mining, you return the land to the way the land should be returned. And then it gives you the standards for returning it. Ms. Livingston, you indicated that the permit was unlawful. Now I think you just said the application was also unlawful. True enough. So if the permit was unlawful, that was unlawful at its inception. True, it was. Okay. But yet no administrative review was taken at that time. And administrative review is not the exclusive remedy allowed by this law, which is backed by the Constitution. I understand you're saying that, but the argument from the other side now is it's res judicata and this is a collateral attack. And there you go with the first exception to res judicata is if it's inconsistent with the equitable implication of a statutory scheme, well, you're not returning the land to an optimum productive use. So it is inconsistent with the very first thing listed in the act to say what is the policy of the state of Illinois? That lands affected by coal mining must be conserved and reclaimed in order to restore them to optimum future productive use. And the conditions of the permit did not provide for that, you're saying. Is that correct? Well, eventually. I mean, when they first started, they didn't have a reclamation plan. And then they just modified it after they poisoned the water to come up with this pumping system to mix their poisoned water in the Kaskaskia and send it downstream. That was something recent that came about in 2002, 2004. This is not the first time that the lead plaintiff, Langenhorst, has been involved with Mine No. 2, right? That's true. He's the township supervisor. He's had two kidneys replaced. He's drank the water. He's pretty motivated. And he was admonished for attempting to relitigate the same issue in the second state administrative appeal? I'm sorry, will you say it again? Was he admonished for attempting to relitigate? Is this really the fourth time some of these issues are being brought to light? Not that I know of. There was the administrative appeal. Then there was a fight about the boundaries, because he thought the permit should have been still open if you're going to change the boundaries and send your water down to the Kaskaskia. Aren't some of the claims here, counsel, word for word from the first administrative appeal? Except for the issue of leaving permanent impoundments as an end use, which is a violation of the statute, which the citizens have the right to compel. Does the solid court even consider preclusion as a result of these claims being raised for perhaps a fourth time? No, because you have the fact that it's inconsistent with an equitable implementation of a statutory scheme. And also the second exception to res judicata, the wrong suffered by the plaintiff is of a recurrent or ongoing nature. Sure is. The water's still poisoned. The land still hasn't been reclaimed. Or the plaintiff clearly and convincingly shows that the policies favoring preclusion are overcome by some extraordinary reason, this is a constitutional right that we're enforcing. I understand that. But is it a fair statement that the very permits at issue here have been subjected to and withstood repeated challenges by the same group of people? They have withstood challenges. And if I was someone and I just moved to that area, and I found out that behind my house was 422 acres of hazardous waste leaching into the aquifer and that the land had not been restored, the fact that I wasn't around when permits were issued years ago would preclude. As a matter of fact, yesterday Let's get back to the issue here with regard to the res judicata. Isn't it true that your challenge to the hydraulic balance relate to the groundwater management zone? I wasn't involved in Mr. Langenhorst's first case, but I imagine that it was involving the groundwater management zone. Yes. And that was included in the permit, correct? It was eventually included in ID&R's permit, yes. Okay. So if so, then you've raised that issue before, contrary to your argument here this morning. Well, the issue wasn't raised that IEPA shouldn't have issued the groundwater management zone. The issue that was raised was that the hydraulic balance was not being taken care of as the statute requires. But that also relates to the management zone. But so specifically, in your January 2005 challenge, it was raised to the permits then. I would say that's true. Although one thing that was not challenged and has never been challenged in the entire state of Illinois is that you're not allowed to have permanent impoundments of anything but clean water. And this isn't like the TVA where it would be coal combustion waste. This is coal production waste, highly toxic. Counsel, the appellate court seemed to say the real issue was whether there were ongoing environmental violations at the site. That's the whole point. That's the point. And that's what they said. Now, admittedly, they didn't look at preclusion. So if we look at preclusion, we would have to look at the preclusive effect of the judgment. And that would extend to all matters that could have been decided as well. Well, I'm going to ask you that. Could any of these continuing violations at the site have been decided as well? Or any of them continuing would seem to indicate that they started at a point in time and continued. Could any of those continuing violations at the site have been raised in a previous case? In a previous determination? Yes, I believe they all could, except I don't know how you would know that you had a permanent impoundment until you knew that reclamation was considered complete. But, yeah, I think you could have raised it. But we have ongoing violations. You could say, hey, that permit's illegal. You shouldn't be doing that in a permit. But it's not the exclusive remedy according to the statute. And the statute reads very clearly. It says, nothing in the administrative review law excludes or impairs the remedies in this law. Citizens can go and sue if they are out of compliance, independent of the permit. But how does, how do we get around the preclusive effect of things that could have been raised for purposes of res judicata and collateral estoppel? What does this Court say to get around res judicata and collateral estoppel? Okay. Well, the exceptions that I just gave you to res judicata about being inconsistent with a statutory scheme, about the ongoing nature, when you get to collateral estoppel, relitigation of an issue in a subsequent action between parties is not precluded when, and this is on page 31 of my brief, when the issue is one of law and the two actions involve claims that are substantially unrelated. If you're talking about you can't have a permanent impoundment versus you can't have an end use that's not really cropland, I think that would be a different issue. And it is a matter of law. As a matter of law, the statute says you can't have a permanent impoundment of poison. As a matter of law, it says you have to return the land to the natural contours. As a matter of law, it says you have to restore the land. The entire legislative purpose, if you allow a permit to collaterally estop people from challenging and enforcing the law, then you've essentially said everybody has to be aware of all the permits that are going on and they could never, then you could never enforce and compel compliance, which is the whole point of the law. And when you look at the legislative history, they even talk about, hey, let's make sure that citizens can get in here and compel when the state doesn't. The fact that IDNR and IEPA did not enforce the law and they're trying to stop enforcement of the law gives you a real good clue about how powerful Exxon really is. And as far as the policies go, when you look at the statute, it tells you that the whole policy of this law is to protect the health, safety, and general welfare of the people, the natural beauty and aesthetic values, and the enhancement of the environment in the affected areas of the state. It tells you that it's to provide. I've had a hard time getting a question in because there's so many questions. I'd like to ask you one question. In the same vein, but from a different approach. If your case were to proceed and you were to succeed, what is the remedy you would receive and specifically would the remedy have anything to say about the permits in terms of this being a collateral attack on the permits? The permits have expired. Reclamation is supposedly complete. So it would have no effect whatsoever on the permits because the mining stopped in 1996. So we're not going to stop mining operations. What is the remedy you would get? The remedy we would get is remove the poison off of the aquifer. Return the land to its natural contours and properly dispose of this waste. Would that be a mandatory injunction? It certainly would. Under Mica-Timber. Would it have anything to say about the permits? It would not. All right. Answered my question. Thank you. Thank you all. There is no evidence in this record or anywhere else that anyone's groundwater has been poisoned. IEPA, IDNR monitors groundwater monthly, quarterly. We monitor it weekly. There is no evidence, although counsel repeatedly has said that before this Court, that there is no evidence that anyone's groundwater has been poisoned. With respect to the permit, citing from the federal regulations, which we have also included in our brief, a permittee need not renew the permit if no surface coal mining operations will be conducted under the permit. Obligations established under a permit continue until completion of surface coal mining and reclamation operations are terminated. We posted a bond which says that until this reclamation is done, they will not release our bond. And if we don't reclaim it in exactly the conditions that the permit required, then they can use our bond to continue that reclamation. There's no evidence here that there's been any violations. As a matter of fact, Justice Thomas, to your question, the trial court, Monterey is saying they're doing what the permit requires. Ms. Livingston, I believe they are doing what the permit required. In the appellate court, plaintiff's counsel confirmed, Ms. Livingston, we are not challenging the performance of their permit. Justice Burke, you asked a question with respect to the groundwater management zone. The corrective action plan and the groundwater management zone were incorporated into the permit. They were challenged in administrative review, they were challenged in the federal review, they were challenged a third time when there was even sanctions threatened, as Justice Thomas pointed out. This is the fourth time that this has been raised. Administrative review process at every step heard what was going on. Ms. Livingston indicates that the permit is unlawful. I think it doesn't require that the end result be restoration to what the land was prior to the coal mining operations. Would you comment on that? I will be happy to. In the administrative review, Your Honor, there were four points that were raised. One, that the land had to be returned to the original contours. That was addressed because RDAs are recognized all over the state and in the department's expertise, that was the best way to treat this. Second, the highest and best use. There is no hierarchy in the statute, either in the federal or in the state, that says it has to be pasture land, which by the way it is now, or that it has to be agricultural land. The department used its expertise to determine that. Impoundments on the site, she's saying they're unlawful by citing a department regulation. That's if they just walked away from an impoundment without sealing it. They kept it here. They kept two and a half inches of soil, they put in tile drains, they did everything the department told them to do with respect to that use. The hydrologic balance of the site was maintained. That's the fourth issue that has been raised repeatedly in every step of the way they have been confirmed. There simply is no evidence here that anything harmful is occurring at that site. And those four issues are addressed in this permit. This is the permit. I'm not talking about a one-page permit that I get if I want to make a home repair to my house and I have to tape it in my window. This is transcripts from the hearings, these are the written comments, these are investigations. This took several years at department expertise, with input from citizens at every single step of the way. This permit is what they did not need to renew, but every obligation required in this permit addresses the issue. And by the way, in our appendix in tab eight, we have, to your point, Justice Thomas, we have on the left side the allegations that are in complaint, and on the right side where it's addressed in the permit. There is no question that every issue that's raised in this complaint, every issue that was raised in administrative review, was covered by the permit and is in their complaint now. And Chief Justice Kilbride, I know you asked a question, Mr. Baroff, and let me take a stab at that as well. I believe your question was what happens if there's new technology or changes that would require the permit to be revisited. And the way that would be done, first of all, is by the department. They have the expertise to determine that. And if a citizen does not believe the department is doing the right job in enforcing that permit, they can file a citizen suit, they can state what they think is wrong, and they can go forward if they want to make that challenge. But that's the process that's involved. And we respectfully ask that the appellate court opinion be reversed, that the trial court's opinion dismissing this lawsuit be affirmed, both on the issue of the permits and on res judicata, and that there's no implied cause of action for the water use. Mr. Eaton, before you sit down, I just want to run this by you as well. Do you agree or disagree with what Ms. Livingston said to the remedy she's seeking here, how that is or is not part of the remedy she would have received before, in terms of the collateral attack question? Well, Your Honor, the remedies that are provided in the citizen suit are very similar to what would be provided in administrative review. If the administrative review process says that circuit court or page or wherever it may be were to decide that the department didn't do its job in issuing the permit, they could stay the issuance of the permit, without the permit, we would be enjoined from proceeding. Let's concede that point. Let's say the agency did everything right, in terms of it, but right now she's claiming this is an enforcement action. Yes. And that the impoundments are sitting on an aquifer that somehow doesn't comply. I don't understand all the specifics, but that not really answers the question, but that's what she says she's seeking. The process, Your Honor, that she has to go through to file a citizen suit is to file a 60-day notice. And that hasn't happened. Well, she did file a 60-day notice, and what she says in the 60-day notice is she wants to revoke the permits. That's what that notice says. It doesn't say there are violations of the permit. It doesn't say that there are violations other than what the permit requires. She wants to revoke the permit. And when she was called upon that at the trial court level, she filed an amended complaint and said, well, these are performance standards violations. It's what the permit entitles Monterey to do. It's what they relied on in spending $30 million to reclaim that land. Thank you. Your Honors, I just want to talk a little bit about the administrative decision here. Before the Department of Natural Resources, this is one of the issues that was adjudicated. This is in the appendix, Monterey's appendix at 8279. Whether the proposed remediation plan for the gob pile, which is the refuge disposal areas, adequately addresses the contamination of the aquifer. That's the groundwater issue. On summary judgment, what the Department found was the petitioners and their expert witnesses, and this is at 8284, the petitioners and their expert witnesses, Robert Johnson, have admitted the revisions as approved prevents material damage to the hydrologic balance outside the mine property and minimizes the disturbance of the hydrologic balance within the mine. Within the boundaries of the mine, the issue has been litigated, the issue has been decided, there is no impairments, there is no leaching poisons into the groundwater here. Now, under the Department's administrative regulations, the expiration of the permit doesn't alter the mining company's obligations. And that's at 62 Illinois Administrative Code, Section 1773.11a. As to the equitable escape from res judicata, it's not, equity doesn't get you out of res judicata if you don't like the result. It gets you out of res judicata if there's been perhaps some procedural flaws, you haven't had an opportunity to be heard, if there's a change in the law, or some other material change in circumstances. None of that has been alleged here. None of that exists here. The law now is the same as the law existed at the time this permit was issued. Again, the citizens of Clinton County, Mr. Lang and Horace, the citizens opposing pollution have had ample opportunity to contest this permit in administrative review. They didn't take, they availed themselves of that, they lost, they didn't seek judicial review of those administrative decisions. There's no basis not to apply the res judicata or collateral estoppel under these circumstances. But let me ask you this question. Let's say the agency's doing everything it can within its power, but we all know that there's budget cutbacks, don't have enough inspectors, and no maliciousness, nothing bad with the IEPA. The water's not being tested. They go out and they get a retired IEPA or whoever, whatever these agencies are, DNR, somebody inspects it, they find that the water tomorrow is impacted. Do they not have the right, despite all this history, to file a new, I think you call it, 60-day notice? And then the agency doesn't do anything. Would they not still be able to enforce that new information tomorrow about pollution? If they're exceeding what they were allowed under the corrective action plan, if there's some other substances may be found in the water that is outside their permitted activity, then the DNR or the citizen would have the power to enforce that as a violation of the permit. In addition, if the citizen doesn't feel the DNR isn't doing an adequate job, they can also file a citizen's complaint with the Federal Office of Surface Mining, which was done here. And the Federal Office of Surface Mining again found that the Department of Natural Resources was complying with all the state requirements and adequately regulating this mine site. So if that answers your question. Well, I'm not sure if it does completely. You're not saying the permit somehow immunizes them from violations, are you? No. It doesn't immunize them from all violations. Let's stop there. You said not all. Are you saying it does for some? Well, it immunizes them. As long as they're complying with the permit, those aren't violations. They are permitted activities. What it doesn't do is allow, what it doesn't immunize them to do is immunize them from permits out from violations that are, violating standards that are outside the permit. Well, I'm only interested in what the permit says. If it's violated, can they not bring that tomorrow? If the permit is violated, yes. If they're not doing what the permit says they're required to do, they can bring that suit. If they're doing what the permit says they're required to do, and there's no allegation here that the Monterey Exxon is violating the permit. This is an attack on the permit itself. It's an attack that says the permit does not comply with the law. That's all of the allegations in this complaint. Okay. Thank you. Case number 111286 and 111304, Citizens Opposing Pollution in Exxon Mobil, is taken under advisement as agenda number 18.